**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS**

**In re: BUFFALO COAL COMPANY, INC.,**

    Debtor,

**JOHN W. TEITZ,** as Chapter 7 Trustee
for **BUFFALO COAL COMPANY, INC.,**

    Appellant,

**v.**                                                **Civil Action No. 2:10-CV-129
(BAILEY)**

                                                          Bankruptcy Case No. 06-0366
                                                          Adv. Proc. No. 08-38

**VIRGINIA ELECTRIC AND POWER
COMPANY, INC., d/b/a DOMINION
VIRGINIA POWER,**

    Appellee.

**MEMORANDUM OPINION AFFIRMING ORDER OF THE BANKRUPTCY COURT**

Pending before the Court is an appeal by John W. Teitz, the Chapter 7 trustee for Buffalo Coal Company, Inc. ("Buffalo Coal") (collectively, the "debtor"), challenging the August 16, 2010, decision of the United States Bankruptcy Court for the Northern District of West Virginia in the debtor's adversary proceeding against Virginia Electric and Power Company, d/b/a Dominion Virginia Power ("Dominion"). In that decision, the bankruptcy court sustained in part and overruled in part the debtor's objections to Dominion's proofs of claim for damages under two coal supply agreements (Claim No. 88) and a roadway lease (Claim No. 114). For the reasons that follow, the Court **AFFIRMS** the decision of the bankruptcy court.

1

# BACKGROUND[1]

I. **Factual History**

    A. **Introduction**

Dominion is a publicly-regulated utility, which operates the Mount Storm Power Station (the "Power Station") in Grant County, West Virginia, one of the largest coal-fired power generation facilities in its fleet. To operate the Power Station, Dominion contracts for coal with third-party suppliers on a regular basis. For over two decades, Buffalo Coal served as such a supplier. In fact, Dominion was the ultimate purchaser of in excess of 90% of Buffalo Coal's total coal production. (R. 95 at 179-80). Dominion purchased such a large quantity because there was a close proximity between Buffalo Coal's operations and the Power Station. (R. 224 at 12).

In 2005, Buffalo Coal began experiencing financial difficulties and, as a result, requested that Dominion agree to restructure their contractual relationship to increase the price to be paid by Dominion. In October 2005, Dominion and Buffalo Coal entered into a new coal supply agreement, which increased the price per ton that Dominion paid to Buffalo Coal. The agreement also included new default provisions whereby Dominion could terminate the agreement in the event of Buffalo Coal's insolvency or inability to pay its debts when due. In February 2006, after many efforts to assist Buffalo Coal in becoming financially stable, Dominion exercised its right to early termination. Whether Dominion had already impliedly waived that right, or was estopped from exercising it, is the issue at the

---

[1]This section utilizes the record citations from the debtor's related appeal, ***Teitz v. Virginia Electric Power Company d/b/a Dominion Virginia Power***, Civil Action No. 2:10-CV-130.

core of this appeal.

### B. First Supply Agreement and the Haul Road Lease

On December 31, 2001, Buffalo Coal entered into a contract with PBS Coals, Inc. ("PBS") to supply coal to Dominion, as a PBS subcontractor (the "PBS Subcontract"). At that time, Buffalo Coal also entered into a direct coal supply agreement with Dominion (the "First Supply Agreement"), which was to continue through December 31, 2005. (R. 118 at § 1.2).

On November 2, 2002, Buffalo Coal and Dominion executed a lease agreement whereby Dominion leased an existing roadway to Buffalo Coal so that the latter would have access to certain coal mining property (the "Haul Road Lease"). Annual rental payments were $4,300.00, adjusted at each renewal period consistent with the National Consumer Price Index. (R. 9 at § 4). In addition to the payment of annual rent, Buffalo Coal agreed to pay all costs and expenses necessary to maintain the roadway in a useable condition; be responsible for any erosion which may occur as a result of Buffalo Coal's use of the roadway; and, on expiration of the lease, Buffalo Coal was obligated to restore the roadway to at least the same condition that existed as of the date the parties executed the lease. (Id. at §§ 6.1-3).

By the middle of 2005, coal production under the First Supply Agreement became unprofitable. The contract price for each ton of coal was about $6 less than the cost of its production. On May 11, 2005, Dominion and Buffalo Coal executed a letter agreement, which modified the First Supply Agreement (R. 102). Specifically, Dominion agreed to temporarily increase the contract price by $20 per ton and to make a prepayment of $1.5 million on future coal shipments. (Id. at 1). In exchange, Buffalo Coal agreed, *inter alia*,

to comply with an audit of its financial records and mining operations conducted by an auditor of Dominion's choice. (Id. at 2).

On June 16, 2005, the two principals of Buffalo Coal, Gerald Ramsburg and Chuck Howdershelt, and the coal company's financial consultant, George Brikis, met with Dominion to discuss the execution of a new coal supply contract. Ramsburg testified that Rick Coles, the head of Dominion's fuels group, led him to believe that Dominion would assist in Buffalo Coal's transition through its difficult financial situation to allow it to begin production under a new agreement. Another employee of Dominion's fuels group suggested that Buffalo Coal should consider filing bankruptcy. However, noting that they had exposure on Buffalo Coal's debts through guarantee agreements and that they had responsibilities to numerous companies, Ramsburg and Howdershelt stated that bankruptcy was not an option.

In the meantime, Dominion hired the accounting firm of KPMG to conduct a full audit of Buffalo Coal's financial condition and a mining expert, Paul Goad of Norwest Corporation, to review Buffalo Coal's mining operations. Goad opined that Buffalo Coal had sufficient reserves to fulfill a supply contract and adequate equipment to reach production goals. KPMG indicated that Buffalo Coal was having difficulty paying its debts as they became due. Both recommended that Dominion increase the contract price. As a result, Dominion determined that it was in its best interest to move forward with a new coal supply agreement. Dominion also determined that it would assist Buffalo Coal in eliminating its exposure under the PBS Coal supply contract. In Dominion's estimation, Buffalo's potential exposure under the PBS Coal contract was about $50 million, and its exposure under the First Supply Agreement was about $38 million.

On July 8, 2005, Dominion and Buffalo Coal executed a second letter agreement, which modified the first letter agreement and the First Supply Agreement. Specifically, Dominion agreed to increase the contract price by $11 per ton. Despite execution of the two letter agreements, however, Dominion continued to demand performance from PBS, which required Buffalo Coal to continue to supply coal to Mount Storm at a lower price than the prices provided in the letter agreements. Notwithstanding the letter agreements, therefore, Buffalo Coal's financial condition worsened.

On August 5, 2005, representatives from Dominion and Buffalo Coal met to negotiate the terms of a new coal supply contract, which would replace all other agreements. The parties reached a "handshake" agreement, whereby Dominion agreed to increase the contract price, agreed to numerous price escalators, and agreed to a 5-year contract for 1 million tons of coal each year. Both parties believed that the final, written version of the "handshake" agreement would be a document Buffalo Coal could use to obtain financing to resolve its liquidity problems. In fact, Brikis, Buffalo Coal's financial consultant, assured Dominion that banks were lined up waiting only on Buffalo Coal to execute the new supply agreement. (See R. 315 at 161).

### C. Second Supply Agreement

On October 27, 2005, Dominion and Buffalo Coal executed the final version of the new supply agreement (the "Second Supply Agreement") (R. 97). The parties contemporaneously executed a settlement agreement of Buffalo Coal's obligations under the First Supply Agreement (the "Settlement Agreement") (R. 96). Buffalo Coal agreed to acknowledge that it defaulted under the First Supply Agreement, resulting in $34.8 million of damages to Dominion. (Id. at 1). In exchange, Dominion agreed to withhold collection

5

of those damages as long as Buffalo Coal adequately performed under the Second Supply Agreement. (Id. at §§ 1.1 & 1.2).

The Second Supply Agreement included termination provisions that were not included in the First Supply Agreement. For example, Article 9.2(a), in conjunction with Articles 9.1(d) and 1.1(c), empowered Dominion to execute an early termination of the Second Supply Agreement based upon Buffalo Coal's insolvency or inability to pay its debts when due. (See R. 97 at §§ 9.2(a), 9.1(d), & 1.1(c)).

In addition, the Second Supply Agreement contained an indemnification provision in favor of Buffalo Coal. Specifically, in Article 11.11(b), Dominion agreed to indemnify Buffalo Coal against all claims in any manner arising out of, resulting from, caused by, or in connection with Dominion's performance of the Second Supply Agreement. (R. 97 at § 11.11(b)).

### D. Termination of the Second Supply Agreement

On November 3, 2005, having not obtained any bank financing, Buffalo Coal's principals requested an additional $2.2 million advanced payment under the Second Supply Agreement to pay its vendors. (R. 95 at 293-95). Edward Roarty, director of commercial fuels at Dominion, refused the request for a prepayment and further stated he was offended that Buffalo Coal would ask for an advance so soon after execution of the Second Supply Agreement, especially considering its assurances that bank financing would be available upon execution. (Id. at 296-97; R. 315 at 170-71). Nevertheless, before concluding the meeting, Roarty contacted Komatsu, one of Buffalo Coal's equipment vendors, to assure the vendor that Buffalo Coal and Dominion had entered into a new contract that provided a higher price per ton (R. 95 at 296-97). Dominion also agreed to arrange for a "zero day

payment cycle" so that Buffalo Coal could get quicker payments from Dominion. (Id. at 298).

Dominion's assistance proved to be of no avail, as Buffalo Coal's financial situation continued to deteriorate. For example, on February 1, 2006, the operational chips on Buffalo Coal's Komatsu equipment were disabled for nonpayment. Komatsu demanded $1.1 million to reenable the equipment. The CDS Family Trust, which leased property to Buffalo Coal and had a lien on nearly all of the company's property, filed a state court complaint for nonpayment of $122,000 in rent. Guteman Oil, the fuel vendor, was owed about $500,000. Moreover, Buffalo Coal had trouble making its deliveries of coal after the November meeting. For example, in December 2005 and January 2006, Buffalo Coal delivered less than 40,000 tons each month, though it had agreed to deliver 60,000 tons in December and 90,000 tons in January. For the first two weeks of February 2006, Buffalo Coal delivered only 7,800 tons.

On February 14, 2006, Ramsburg and Howdershelt, Buffalo Coal's principals, participated in a telephone conference with Karla Haislip, who replaced Rick Coles as head of Dominion's fuels group. During this conference, Ramsburg believed that he heard Haislip mention something about how Buffalo Coal should consider bankruptcy, and if it filed, there may be some things that Dominion could do to help. Haislip denies ever suggesting to Buffalo Coal that it should file bankruptcy. Nevertheless, after the conference, Ramsburg directed Brikis to go to Dominion's offices in Richmond, Virginia, to discover what Dominion meant by suggesting bankruptcy.

On February 16, 2006, Haislip met with Brikis upon his request and being informed by Buffalo Coal's principals that the meeting was "very important." At the meeting, Brikis

7

discussed a potential bankruptcy filing by Buffalo Coal and outlined the effect of such a proceeding for Buffalo Coal and Dominion. The meeting lasted between two and three hours. Brikis stated that Haislip was attentive, she asked some questions, but she was non-committal. At the end of the meeting, Haislip asked Brikis to summarize in writing what he had presented.

With permission from Howdershelt, Brikis memorialized his summary in a February 20, 2006, email, which outlined "what Buffalo . . . propos[ed] as a role for Dominion/Vepco in the company's Ch. 11 reorganization plan." (R. 14-43 at 1). The e-mail states, *inter alia*, that Buffalo Coal intended to file a Chapter 11 bankruptcy, renegotiate a $10 per ton increase in the contract price of the Second Supply Agreement, and have Dominion serve as Buffalo Coal's debtor-in-possession lender for a $6.5 million loan. (Id. at 1-3). Time was stated to be "of the essence" in that Buffalo Coal only had a few weeks to identify a bankruptcy lender. (Id. at 2).

David Holden, Dominion's vice president of enterprise risk management, described Brikis' email as "the straw that broke the camel's back:"

> We had been working with Buffalo for, at that point, almost a year. We had prepaid for tons. We had renegotiated the contract. We had entered into a second level agreement to provide a bridge between the initial communication and our negotiation of the Dominion contract executed in October. All of these things to ensure that Buffalo had everything it needed to operate comfortably and profitably right after execution of this agreement in October 2005.
> On February 20th . . . we get a letter or email of Buffalo's intent to file bankruptcy. At that point we have done all we believe humanly possible to support Buffalo and my opinion was we have no obligation to do anything further.
> . . .
> I can tell you my recommendation [to terminate the Second Supply Agreement] was based on the Brikis email which is the straw that broke the camel's back as well as all the activities that had taken place from the

8

beginning of 2005 until February 2006.

(R. 307 at 126-29).

By letter dated February 22, 2006, Dominion terminated its Second Supply Agreement with Buffalo Coal (R. 136). In the letter, Dominion cites Buffalo Coal's insolvency and inability to pay debts when due as the basis for Dominion's early termination. (Id. at 1). Haislip, who signed the termination letter on behalf of Dominion, testified that the Agreement was terminated solely on the grounds of Buffalo Coal's insolvency and inability to pay debts when due, pursuant to Article 9.1(d) of the Second Supply Agreement. (R. 237 at 237).

On February 24, 2006, Buffalo Coal shut down its mining facilities, terminated its employees, and ceased all operations on a permanent basis. (R. 135 at 379-80; R. 12-5 at 21-22). As a result, Buffalo Coal incurred third-party liabilities in the form of claims and demands by the States of West Virginia and Maryland for environmental reclamation.

On March 3, 2006, Dominion made a demand on Buffalo Coal to pay damages under the Second Supply Agreement, which it estimated to be about $56 million, and damages for breach of the Settlement Agreement, which it estimated to be about $32 million. On the same day, Dominion also terminated the Haul Road Lease.

On March 7, 2006, an attorney for Buffalo Coal responded to Dominion's termination letter and liquidated damages demand. The letter disputed Dominion's termination payment calculation and whether an event of default had occurred. The letter also asserted that Dominion's withholding of payment constituted an event of default and provided Dominion with three days to cure the default.

9

## II. Procedural History

On March 9, 2006, Dominion filed a suit against Buffalo Coal and its guarantors in the United States District Court for the Eastern District of Virginia. The complaint sought breach of contract damages and payment on guarantees of approximately $88 million under the Second Supply Agreement and the Settlement Agreement. On May 5, 2006, Buffalo Coal filed in the United States Bankruptcy Court for the Northern District of West Virginia for Chapter 11 bankruptcy, which was converted to a Chapter 7 bankruptcy on June 13, 2007. As a result, Dominion's action in the Eastern District of Virginia was stayed and later dismissed.

On August 22, 2006, Dominion filed a proof of claim (Claim No. 88) in the amount of $88,408,616.00 allegedly arising from Buffalo Coal's breach of the Second Supply Agreement and the Settlement Agreement (R. 7). On September 13, 2006, Dominion filed a proof of claim (Claim No. 114) in the amount of $1,240,825.60 allegedly arising from Buffalo Coal's breach of the Haul Road Lease.

On September 10, 2007, John W. Teitz (the "Trustee") was appointed as the Chapter 7 trustee to administer Buffalo Coal's bankruptcy estate. On May 1, 2008, the Trustee filed a complaint against Dominion in the bankruptcy court, commencing the adversary proceeding that is the subject of this appeal. The Trustee amended the complaint on May 27, 2008. The amended complaint contains three counts. Count I alleges that Dominion breached the Second Supply Agreement when it repudiated the agreement by letter on February 22, 2006, without a prior written demand for performance. Count II alleges that Dominion is obligated to indemnify the debtor against environmental reclamation liabilities and other third-party claims resulting from Dominion's termination of

the Second Supply Agreement. Count III alleges that Dominion's termination of the Second Supply Agreement constitutes a breach of the Settlement Agreement. The amended complaint also contains two objections. Specifically, based upon Dominion's wrongful termination of the Second Supply Agreement, the Trustee objects to Claim No. 88 and Claim No. 114. Dominion filed a timely answer to the amended complaint.

On March 27, 2009, Dominion moved for summary judgment on all three counts of the amended complaint. On September 30, 2009, the bankruptcy court granted summary judgment against the Trustee on his indemnification claim [Bk. Doc. 331]. In so doing, the bankruptcy court found that the indemnification claim seeks consequential damages which are specifically excluded by the Second Supply Agreement. (Id. at 21-22). As such, the bankruptcy court dismissed the indemnification claim.[2] (Id. at 23). However, the bankruptcy court found that genuine issues of material fact existed regarding whether Dominion waived or was equitably estopped from exercising its right to terminate the Second Supply Agreement based upon Buffalo Coal's insolvency. (Id. at 12-15). Accordingly, the bankruptcy court denied summary judgment on the Trustee's breach of contract claims. (Id. at 22).

The Trustee's breach of contract claims proceeded to an eight-day trial commencing on March 1, 2010. Based upon the evidence adduced at trial, as well as deposition testimony submitted post-trial, the bankruptcy court denied relief on the Trustee's breach of contract claims [Bk. Doc. 617]. In so doing, the bankruptcy court rejected the Trustee's

---

[2]This Court previously denied the Trustee's motion for leave to file an interlocutory appeal from the bankruptcy court's dismissal of his indemnification claim. ***Teitz v. Virginia Electric Power Company d/b/a Dominion Virginia Power***, Case No. 2:10-MC-1, Order Denying Motion for Leave to Appeal Interlocutory Order (N.D. W.Va. Jan. 8, 2010).

11

argument that Dominion either impliedly waived, or was estopped from raising, Buffalo Coal's insolvency as a ground for terminating the Second Supply Agreement. (Id. at 10).

With regard to waiver, the bankruptcy court was unpersuaded that "the Trustee . . . demonstrated clear and convincing evidence that [Dominion] impliedly waived its right to terminate the Second Supply Agreement based on Buffalo Coal's insolvency." (Id.). "Specifically, the court [did] not believe that the Trustee proved waiver . . . because the parties' relationship and expectations as of February 22, 2006, were far different than their relationship and expectations at the time the Second Supply Agreement was executed on October 27, 2005." (Id. at 14).

As for estoppel, the bankruptcy court was likewise unpersuaded that "the Trustee . . . met his burden of showing clear, precise, and unequivocal evidence that DVP is estopped from raising insolvency as an event of default." (Id. at 10). "Specifically regarding estoppel, the Trustee failed to demonstrate that a material fact was falsely represented or concealed." (Id. at 14). Accordingly, the bankruptcy court denied the relief sought in the amended complaint.

In a separate Order, entered on August 16, 2010, the bankruptcy court sustained in part the Trustee's objection to Dominion's claim for damages under the Second Supply Agreement and the Settlement Agreement (Claim No. 88). (R. 6). Specifically, the bankruptcy court found that permitting Dominion to seek damages under both agreements would improperly allow Dominion a double recovery. (Id. at 5-6). Accordingly, the bankruptcy court granted Dominion an additional 30 days within which to file an amended proof of claim. (Id. at 6). Next, the bankruptcy court overruled the Trustee's objection to Dominion's claim for damages under the Haul Road Lease. (Id.). In particular, the

12

bankruptcy court found that the Trustee had failed to "demonstrate that any of the estimated charges were unreasonable or unwarranted given Buffalo Coal's lease obligations." (Id.). The Trustee now appeals from the bankruptcy court's decision to the extent that it overrules his objections.

## DISCUSSION

**I.     Standard of Review**

Pursuant to Rule 8013 of the Federal Rules of Bankruptcy Procedure, "the district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses." Fed. R. Bankr. P. 8013.

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." **Anderson v. Bessemer City**, 470 U.S. 564, 573 (1985) (quoting **United States v. United States Gypsum Co.**, 333 U.S. 364, 395 (1948)). With respect to a bankruptcy court's conclusions of law, the appropriate standard of review is *de novo.* See **In re Mitrano**, 409 B.R. 812, 815 (E.D. Va. 2009); **In re Meredith**, 527 F.3d 372, 375 (4th Cir. 2008); **Gilbert v. Scratch 'N Smell, Inc.**, 756 F.2d 320 (4th Cir. 1985). In cases where the issues present mixed questions of law and fact, the reviewing court applies the clearly erroneous standard to the factual portion of the inquiry and *de novo* review to the legal conclusions derived from those facts. See **Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond**, 80 F.3d 895, 905 (4th Cir. 1996). Finally, decisions

13

committed to the discretion of the bankruptcy court are reviewed for abuse of discretion. See **In re Morris**, 385 B.R. 823, 828 (E.D. Va. 2008).

**II.     Analysis**

The debtor asserts that the bankruptcy court erred by overruling its objections to Dominion's proofs of claim, when the evidence showed that Dominion had improperly terminated the Second Supply Agreement. For the reasons that follow, this Court finds no error.

The basis for this appeal is that Dominion improperly terminated the Second Supply Agreement, thus preventing Buffalo Coal's performance under that Agreement, the Settlement Agreement, and the Haul Road Lease. However, this Court's previous ruling affirming the bankruptcy court's August 16, 2010, decision that the termination was proper renders that basis meritless. See **Teitz v. Virginia Electric Power Company d/b/a Dominion Virginia Power**, Civil Action No. 2:10-CV-130, Memorandum Opinion Affirming Orders of the Bankruptcy Court (N.D. W.Va. Mar. 8, 2011). Accordingly, for the same reasons stated before, this Court hereby **AFFIRMS** the bankruptcy court's rulings on the Trustee's objections to Dominion's proofs of claim (Claim Nos. 88 and 114).

## CONCLUSION

For the foregoing reasons, the Court finds that the bankruptcy court's decision should be, and hereby is, **AFFIRMED**. It is further **ORDERED** that this appeal should be, and hereby is, **DISMISSED** and **STRICKEN** from the active docket of this Court.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein and to the Clerk of the United States Bankruptcy Court for the Northern District of West

Virginia.

**DATED**: March 8, 2011.

/s/ John Preston Bailey
JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE